41 F.3d 1504
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Stephen Earl POLLARD, a/k/a James Earl Edwards, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellant,
v.
Stephen Earl POLLARD, a/k/a James Earl Edwards, Defendant-Appellee.
 Nos. 94-5072, 94-5138.
 United States Court of Appeals, Fourth Circuit.
 Submitted Oct. 18, 1994.
Decided Nov. 18, 1994.
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. James C. Cacheris, Chief District Judge. (CR-93-287)
 James C. Clark, LAND, CLARK, CARROLL & MENDELSON, P.C., Alexandria, Virginia, for Appellant. Helen F. Fahey, United States Attorney, William G. Otis, Senior Litigation Counsel, Mark J. Hulkower, Assistant United States Attorney, Alexandria, Virginia, for Appellee.
 E.D.Va.
 AFFIRMED IN PART AND VACATED AND REMANDED IN PART.
 Before HALL and WILKINS, Circuit Judges, and SPROUSE, Senior Circuit Judge.
 PER CURIAM:
 
 OPINION
 
 1
 Stephen Earl Pollard was convicted in a bench trial of kidnapping, 18 U.S.C. Sec. 1201 (1988). He was charged with driving Molly Rose from Alexandria, Virginia, to West Virginia against her will in order to have sex with her. In sentencing Pollard, the district court departed below the guideline range pursuant to guideline section 4A1.3, p.s.[1] and imposed a sentence of 262 months. Pollard appeals his conviction, arguing that there was insufficient evidence of kidnapping and that the district court erred in permitting the government to introduce hearsay evidence during its cross-examination of a defense witness. The government appeals the downward departure. We affirm Pollard's conviction, but vacate his sentence and remand for resentencing within the guideline range.
 
 
 2
 Pollard met Rose through a mutual friend two days before the kidnapping. Rose was seventeen at the time and lived with her grandparents. She agreed to have dinner with Pollard on August 2, 1989. At trial, they offered very different accounts of the evening.
 
 
 3
 Rose testified that, after meeting her around 8:30 p.m., Pollard drove for about thirty minutes without telling her where he was taking her. At this point, Rose said she became concerned because she did not recognize her surroundings and she was afraid of missing her 11:00 p.m. curfew. She suggested that they get together another time. Pollard at first did not respond, but then told her she was not going home. Rose subsequently asked to be taken home several times, and also asked Pollard to stop so she could call home and use the bathroom; however, Pollard continued driving on a four-lane highway. Rose said Pollard eventually exited off the highway, drove along a two-lane road for a short distance, and then turned onto a driveway or small road, which she later learned was Smith Lane. Pollard proceeded to rape Rose, who nevertheless managed to escape before Pollard ejaculated. She ran to a nearby diner where she reported the rape and learned that she was in West Virginia. The government presented testimony from other witnesses which corroborated Rose's testimony.[2]
 
 
 4
 One of the waitresses in the diner described Rose's appearance there. Her grandmother testified about the bruises Rose received. An inmate with whom Pollard was later confined testified that Pollard told him he drove Molly Rose to West Virginia using Route 7 because he thought she would offer no resistance there, and then had sex with her against her will. The case agent testified that it was 70 miles from Alexandria to Smith Lane via Route 7, and that all but the last nine-tenths of a mile was in Virginia.
 
 
 5
 Pollard testified that he bought a six-pack of beer after meeting Rose, which they drank together while driving amicably toward West Virginia. Pollard said Rose did not object when he put his arm around her and fondled her while driving. He said when he stopped the car on Smith Lane, he continued to drink beer and to kiss and fondle Rose until she suddenly became upset, got out of the car, and disappeared.
 
 
 6
 A verdict must be sustained if, taking the view most favorable to the government, there is substantial evidence to support it. Glasser v. United States, 315 U.S. 60, 80 (1942). The government's burden here was to prove that Pollard transported Rose across the state line without her consent. See United States v. Childress, 26 F.3d 498, 501 (4th Cir.1994), petition for cert. filed, # 6D 6D6D6D# U.S.L.W. ---- (U.S. Oct. 4, 1994). Although Pollard testified that Rose was a willing companion until they arrived at Smith Lane, and also argued that there was no definitive evidence that she withdrew her consent to remain in his company while the couple was in Virginia, the district court found that Rose was a more credible witness than Pollard, and that her testimony was corroborated by the government's other evidence. The court could reasonably find from the evidence that Rose made known her desire to return home while she was still in Virginia, and that Pollard took her across the state line against her will for the purpose of sexually assaulting her.
 
 
 7
 In an attempt to discredit Rose's testimony that she had early on asked to be taken home, defense counsel called Deborah Lawson, who had represented Pollard in the state proceeding. Lawson testified that, at the state preliminary hearing, which was not recorded, Rose testified that she first said she wanted to get out of the car at the very end of a two-hour drive. During the government's cross-examination, Lawson was asked if she would be surprised to know that Michael Thompson, the state prosecutor, did not recall that Rose said she had waited that long before asking to go home. Lawson responded that Rose at some point had asked a question which drew the response from Pollard that she was "not going home," but that Rose had not given an exact time when this happened. Lawson thought it was shortly before the attack, and said her recollection might be different from Thompson's.
 
 
 8
 The government then presented a stipulation as to how Magistrate Santucci, who presided at the state preliminary hearing, would testify concerning Rose's testimony. The stipulation said that Rose told Pollard she wanted to go home as soon as her surroundings became unfamiliar, and that she told him she wanted to go home more than once. Lawson then backed away somewhat from her earlier assertion that Rose did not tell Pollard she wanted to leave until just before he attacked her. Lawson agreed that Rose said she wanted to go home as soon as she did not recognize her surroundings, but said that Rose had not given a specific time when she realized she did not recognize her surroundings. Lawson said that she did not disagree with either Thompson or Magistrate Santucci that Rose asked to go home at that point.
 
 
 9
 Pollard claims that the government improperly introduced hearsay evidence through its cross-examination of Lawson by assuring the court that Thompson would later be called as a witness, although he was never called. Pollard alleges that he was thus denied the opportunity to confront and cross-examine Thompson. Pollard concedes in his reply brief that Thompson was present and available as a witness.
 
 
 10
 It is true, of course, that the government may not use "artful cross-examination" to introduce otherwise inadmissible hearsay evidence. United States v. Hall, 989 F.2d 711, 716 (4th Cir.1993) (citing Goldsmith v. Witkowski, 981 F.2d 697, 704 (4th Cir.1992), cert. denied, 61 U.S.L.W. 3853 (U.S.1993)). However, this case is significantly different than Hall. In Hall, the prosecutor effectively breached the marital privilege by questioning Hall about his wife's "extremely damaging inculpatory" statements concerning Hall's sale and use of cocaine. Here, the cross-examination merely clarified Lawson's version of events. Moreover, the stipulation as to the magistrate's recollection was more material than the mention of Thompson's recollection. Therefore, even if the government introduced inadmissible hearsay evidence, the error was harmless, because it was not significant enough to have denied Pollard a fair trial. See United States v. Bagley, 473 U.S. 667, 675-76 (1985) (quoting United States v. Agurs, 427 U.S. 97, 108 (1976)).
 
 
 11
 Prior to sentencing, the probation officer calculated Pollard's offense level at thirty-seven and his criminal history score at fourteen (category VI), which gave him a guideline range of 360 months to life. At the sentencing hearing, Pollard requested a downward departure under guideline section 4A1.3 because his prior convictions were for relatively minor crimes. The district court eventually departed downward under guideline section 4A1.3 from criminal history category VI to category III and imposed a sentence of 262 months.
 
 
 12
 Departures are reviewed under the test set out in United States v. Summers, 893 F.2d 63, 66-67 (4th Cir.1990), and United States v. Hummer, 916 F.2d 186, 192 (4th Cir.1990), cert. denied, 499 U.S. 970 (1991). The district court must first identify a mitigating factor not adequately considered by the Sentencing Commission. A downward departure under guideline section 4A1.3 is authorized when the defendant's criminal history category significantly over-represents the seriousness of his criminal history or the likelihood that he will commit further crimes, and the district court concludes that his criminal history is significantly less serious than that of most defendants in the same criminal history category. We review for clear error the district court's decision that there was adequate factual support for a departure on the basis of overstated criminal history.[3] We review under an abuse of discretion standard the district court's decision that the factor is of sufficient importance to justify a departure and as to the extent of the departure.
 
 
 13
 The district court here reviewed Pollard's prior offenses and found as a mitigating factor that he would be too old to commit rape again if his sentence kept him incarcerated until he was over fifty years old.[4] The court stated:
 
 
 14
 This case is a rape case. I think it's very unlikely that this defendant is going to commit a rape again. With the sentence the Court plans to impose ... he'll be at an age where burnout affects people, and I take judicial notice from my ten years on the state bench where I tried a ton of these rape cases, where I think there's a burnout factor to people who certainly get into their 40s, and he'll be certainly almost in his 50s when he gets out.
 
 
 15
 In response to subsequent comments by the government, the district court stated, "[H]e's a petty thief who's got a drug problem ... that's why I'm departing downward," and "I don't think it follows predictability (sic) on the basis of his prior record that he would commit a rape."
 
 
 16
 The government maintains that the district court did not identify a mitigating circumstance which was inadequately considered in the computation of Pollard's sentence, and departed simply because it decided the 360-month sentence was too long. We agree that the court appears to have departed because of its perception that there was small "likelihood that the defendant will commit other [similar] crimes." USSG Sec. 4A1.3. That perception in turn seems to have been based in part on the fact that Pollard had no prior convictions for sexual offenses, and in part on the court's belief that he would experience "burnout" before completing a term of twenty-two years.
 
 
 17
 Neither of these facts are mitigating circumstances which adequately support a departure under section 4A1.3. The government argues with apparent justification that the district court decided what an appropriate sentence would be, in its view, and then arrived at that sentence through a departure under section 4A1.3. This approach was rejected in United States v. Van Dyke, 895 F.2d 984, 987 (4th Cir.), cert. denied, 498 U.S. 838 (1990), in which this Court held that a sentencing court could not depart simply because it believed the guideline sentence was longer than needed. See also United States v. Jackson, 30 F.3d 199, 203 (1st Cir.1994) (district court's dissatisfaction with severity of sentence not basis for departure). Therefore, we find that the district court clearly erred in finding that an adequate mitigating circumstance existed in the case. We vacate the sentence imposed and remand for resentencing within the guideline range.[5] We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court and argument would not aid the decisional process.
 
 
 18
 CONVICTION AFFIRMED; SENTENCE VACATED AND REMANDED
 
 
 
 [1]
 United States Sentencing Commission, Guidelines Manual (Nov.1993)
 
 
 [2]
 A few days later, Pollard left Virginia with his girlfriend and her children (in whose house he had been living). He was charged with kidnapping and rape in West Virginia, but remained a fugitive for two years. When apprehended, he pled guilty to a reduced charge of attempted sexual assault for which he served five months. After his release, he was arrested on federal kidnapping charges
 
 
 [3]
 In Summers, the district court found as a mitigating circumstance that the defendant's criminal history score was "exaggerated" by the inclusion of a number of driving without a license convictions. This Court held that the district court's factual finding was not clearly erroneous. 893 F.2d at 67
 
 
 [4]
 Pollard was thirty-one years old when he was sentenced, and had the following prior convictions: battery, petty theft, theft, trespassing/peeping tom, possession of PCP, larceny, concealed weapon, possession of marijuana, possession with intent to distribute marijuana, telephone violation (threats), and shoplifting. (JA-I at 318, JA-II at 335-37)
 
 
 [5]
 We need not reach the issues of whether the district court abused its discretion in deciding that a departure should result and in determining the extent of the departure