45 F.3d 428
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Ovel R. SANCHEZ, a/k/a Mickey Sanchez, Defendant-Appellant.
 No. 93-5972.
 United States Court of Appeals, Fourth Circuit.
 Argued Nov. 4, 1994.
Decided Jan. 10, 1995.
 
 Appeal from the United States District Court for the District of South Carolina, at Greenville. G. Ross Anderson, Jr., District Judge. (CR-93-65)
 ARGUED: Nina Jean Ginsberg, DIMURO, GINSBERG & LIEBERMAN, P.C., Alexandria, VA, for Appellant. David Calhoun Stephens, Assistant United States Attorney, Greenville, SC, for Appellee. ON BRIEF: Michael W. Liebermann, SHAPIRO & ASSOCIATES, Alexandria, VA, for Appellant. J. Preston
 Strom, Jr., United States Attorney, Harold W. Gowdy, III, Assistant United States Attorney, Greenville, SC, for Appellee.
 D.S.C.
 AFFIRMED.
 Before ERVIN, Chief Judge, RUSSELL, Circuit Judge, and MACKENZIE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Defendant Ovel R. "Mickey" Sanchez appeals various aspects of his conviction for conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. Sec. 846. We affirm.
 
 I.
 
 2
 Defendant Sanchez, a resident of Miami, Florida, was charged with conspiracy to possess with intent to distribute cocaine. Approximately sixty codefendants had been named in the conspiracy, but only Sanchez elected to go to trial. The government offered evidence that Sanchez had supplied cocaine to a loose-knit group of dealers primarily located in South Carolina and North Carolina. The government relied almost exclusively on the testimony of codefendant Mark Chapman to link Sanchez to the conspiracy. Chapman testified that he had known Sanchez for about six years and that they were friends. Five other codefendants testified against Sanchez, but none knew him or had any direct contact with him. The government used their testimony to establish the existence, size, and scope of the conspiracy. Chapman testified that he was the connection between Sanchez and the lower levels of the distribution chain and that he had bought between six and eight kilograms of cocaine from Sanchez during an eighteen-month period beginning in the fall of 1989.
 
 
 3
 Chapman had been arrested on October 18, 1992, and admitted distributing twenty-five kilograms of cocaine. In exchange for the opportunity to plead guilty to distributing only two kilograms of cocaine, he cooperated with the government by initiating tape-recorded telephone calls to Sanchez and explaining the conversations at trial.[1] Although the conversations never specifically mentioned drugs, Chapman testified that Sanchez used a code involving golf terminology. Thus, according to Chapman, "rounds of golf" meant kilograms of cocaine and "green fees" referred to price during the key part of their conversation:
 
 
 4
 CHAPMAN: Um, I thought I might check back in with you the beginning of next week about maybe playing a couple rounds of golf.
 
 
 5
 SANCHEZ: Absolutely.
 
 
 6
 CHAPMAN: What's the chances of the green fees being about the same we talked about last time?
 
 
 7
 SANCHEZ: I don't know. You know what's happened this past couple of weeks right?
 
 
 8
 CHAPMAN: No.
 
 
 9
 SANCHEZ: The last couple week, you know like they did before, I can't get, ya know, uh, BF Goodrich is really fucking with the PCB, ya know that?
 
 CHAPMAN: Okay
 
 10
 SANCHEZ: Uh, but uh, ya know, their, that's, ya know, see what happens, ya know what I'm saying?
 
 
 11
 Joint Appendix at 127-28. Chapman also testified that he did not play golf.
 
 
 12
 Sanchez admitted that the calls occurred and identified his voice on the tapes, but he maintained that Chapman lied about the golf code. Sanchez testified that he belonged to a club that allowed him to play golf on a number of courses in South Florida and he described how green fees depended on the season. Sanchez further explained that "BF Goodrich" and "PCB" were not brands of cocaine, as Chapman had speculated, but referred instead to a conversation he was having with someone in his apartment while he was on the phone with Chapman. Sanchez also claimed that Chapman called him at least six other times to buy drugs and that Chapman stopped calling when Sanchez discussed the calls with a narcotics investigator in Hialeah, Florida.
 
 
 13
 At trial, Officer Charles J. Grant of the Rock Hill, South Carolina, Police Department, who recorded the phone conversations in Chapman's house, offered his opinion regarding what Sanchez had meant. Grant testified that Chapman had warned him to expect golf terms to be used instead of drug terms and then he repeated Chapman's interpretation of the conversation. Drug Enforcement Agent Albert W. Watson, Jr., also testified that the taped conversation conformed to drug calls he had heard during his seventeen years of experience and his setting up of more than five hundred recorded conversations involving narcotics investigations.
 
 
 14
 On cross-examination, the government questioned Sanchez about several recent occasions when he had tested positive for cocaine while on pretrial release. Sanchez testified that he was having problems with his fiancee and that he had asked police officers in Dade County, Florida, to remove her from his house because she kept drugs there.[2]
 
 
 15
 Although the prosecutor made arguably inappropriate statements and elicited questionable testimony during the trial, Sanchez's attorney objected only once at trial to an unrelated matter.[3] On August 5, 1993, a jury found Sanchez guilty of the conspiracy charge. On December 10, 1993, the district court sentenced Sanchez to 170 months in prison, five years supervised release, and a special assessment of $50.00.
 
 II.
 
 16
 Because Sanchez did not object below to the issues he now raises on appeal, we review only for plain error. See Fed.R.Crim.P. 52(b) (providing federal courts of appeals limited power to correct errors that were forfeited because they were not timely raised in district court). The Supreme Court has defined plain error as: (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity or public reputation of the judicial proceedings. United States v. Olano, 113 S.Ct. 1770, 1777-79 (1993), cited in United States v. Childress, 26 F.3d 498, 502 (4th Cir.), cert. filed, --- S.Ct. ---- (Oct. 4, 1994).
 
 III.
 
 17
 We first address Sanchez's contention that the prosecutor did not "fight fair" because he used improper and inflammatory tactics throughout the trial. Sanchez quotes frequently from the trial transcript to illustrate the prosecutor's improper arguments, questioning of witnesses, and comments. Although the prosecutor's tactics and language may not have seemed fair to Sanchez, who considered the government's case against him weak, we find that they did not constitute plain error.
 
 
 18
 This Court has held that "the test for reversible prosecutorial misconduct generally has two components: that '(1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial.' " United States v. Mitchell, 1 F.3d 235, 240 (4th Cir.1993) (quoting United States v. Brockingham, 849 F.2d 872, 875 (4th Cir.1988)). Regarding the second component, this Court has considered the following factors relevant in determining possible prejudice to a defendant: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters. United States v. Harrison, 716 F.2d 1050, 1052 (4th Cir.1983), cert. denied, 466 U.S. 972 (1984). When these criteria are considered under a plain error standard of review, it is evident that the prosecutor did not commit misconduct that denied Sanchez a fair trial.
 
 
 19
 Sanchez first complains that the prosecutor introduced excessive evidence of the conspiracy and made comments in his closing argument that unfairly placed Sanchez at the center of a large drug conspiracy. In particular, Sanchez points out that during closing argument the prosecutor referred to all the cocaine entered in evidence, but not directly connected to Sanchez, and told the jury: "You can see how much drugs this organization had.... [L]ook at the amount of drugs that came into South Carolina and see what [Sanchez] is responsible for." JA at 203. Although the evidence linking Sanchez to the conspiracy, apart from the taped conversation, was sparse and such statements could have prejudiced him, the government did have the burden of proving that the conspiracy existed and it did so by introducing evidence from the drug busts of Sanchez's codefendants. As a member of the alleged conspiracy, Sanchez cannot complain about the government's tactics; it simply blamed him for his part in the overall success of the organization.
 
 
 20
 Sanchez also identifies an inflammatory remark made by the prosecutor in his closing argument and alleges that the comment was designed to incite the jury against him by invoking his ethnic Cuban background and the jury's fear of South American drugs poisoning their neighborhoods. The prosecutor did claim that "Sanchez is that next source straight into the South American market," JA at 217, but Chapman had testified that he had seen "one Latin guy" at Sanchez's home when drugs were purchased, JA at 153. The prosecutor may have stretched the inferences that reasonably could be drawn from this particular shred of evidence, but not in a reversible manner.
 
 
 21
 Finally, Sanchez claims that during closing argument the prosecutor impermissibly vouched for his chief witness and added his personal opinion that Sanchez had lied.[4] Sanchez's examples of vouching for Chapman are unconvincing; they fail to demonstrate that the jury could have inferred, "from the form of counsel's language, that he had access to extra-judicial information, not available to the jury." United States v. Moore, 710 F.2d 157, 159 (4th Cir.), cert. denied, 464 U.S. 862 (1983). The prosecutor's statement about Sanchez, however, is more troubling:
 
 
 22
 ... you may now consider why Mr. Sanchez would take the stand and tell that convoluted crazy story that he told y'all here today and it's because he has a reason to lie. And that reason to lie is he's afraid to go to jail, because he knows that he's guilty beyond a reasonable doubt.
 
 
 23
 JA at 223. Nonetheless, given the evidence against Sanchez, including the taped conversation and Chapman's testimony, the prosecutor's indiscretion did not "seriously affect the fairness, integrity or public reputation of the judicial proceedings." Olano, 113 S.Ct. at 1779 (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936)). Therefore, we find no plain error in the prosecutor's comments on Sanchez and Chapman during closing argument.
 
 IV.
 
 24
 Sanchez next challenges the admissibility of testimony regarding his personal drug use and six drug tests that indicated he had taken cocaine while on pretrial release, about two and one half years after his alleged involvement in the conspiracy. Specifically, he contends that admitting the test results violated Rules 403[5] and 404(b)[6] of the Federal Rules of Evidence. These challenges, however, lack merit.
 
 
 25
 Under Rule 404(b), "proof of prior bad acts may be admitted into evidence when they are '(1) relevant to an issue other than character, (2) necessary, and (3) reliable.' " United States v. Mills, 995 F.2d 480, 485 (4th Cir.) (quoting United States v. Rawle, 845 F.2d 1244, 1247 (4th Cir.1988)), cert. denied, 114 S.Ct. 283 (1993).
 
 
 26
 The government points out that the prosecutor asked about Sanchez's personal drug use for the proper Rule 404(b) purposes of showing intent to engage in the conspiracy, motive to support his significant cocaine habit, and knowledge of the drug industry. See Mills, 995 F.2d at 485. Sanchez rendered the evidence necessary by testifying that although he used cocaine, he had no idea why Chapman would call him as a drug source. Sanchez did not challenge the reliability of the test results at trial; instead, he offered the jury an implausible explanation for why he had tested positive--essentially blaming his fiancee for keeping drugs in his home. Furthermore, in United States v. Rhodes, 779 F.2d 1019, 1030 (4th Cir.1985), cert. denied, 476 U.S. 1182 (1986), this Court found that "evidence introduced by the government as to [a defendant's] personal drug use as well as the general patterns of his personal life" did not constitute plain error.
 
 
 27
 The government does not directly address Sanchez's unfair prejudice claim under Rule 403. Sanchez argues that because the case boiled down to a credibility contest between Chapman and himself, failed drug tests indicating frequent drug use and the incredible explanation Sanchez offered constituted unduly prejudicial propensity evidence that cost him the verdict. Sanchez also notes that the jury obviously was confused because it asked the district court why he was taking periodic drug tests and how long cocaine remains in the system, questions which the court declined to answer because these facts were not in evidence.
 
 
 28
 Sanchez's own testimony, however, raised the issue of why Chapman would call him to buy cocaine. Although prejudicial, as effective evidence necessarily must be, we find that the introduction of the drug tests in evidence was not unfairly prejudicial or misleading. Therefore, it did not constitute plain error.
 
 V.
 
 29
 Sanchez also argues that the testimony of Chapman, Officer Grant, and Agent Watson regarding the phone conversation should have been excluded because it was unhelpful to the jury. In addition, Sanchez claims that the testimony of Officer Grant and Agent Watson improperly bolstered Chapman's testimony. Sanchez alleges that three progressively more credible witnesses repeated the same interpretation of the crucial conversation. First Chapman, a codefendant who admitted dealing cocaine, explained his conversation with Sanchez. Second, Officer Grant opined what he thought the conversation meant by essentially repeating Chapman's interpretation, based exclusively upon what Chapman had told him before calling Sanchez. Third, Agent Watson, an "expert" in drug investigation conversations, testified that Sanchez's language conformed to what he knew of the drug trade.
 
 
 30
 This Court has held that the key inquiry under Rule 701 of the Federal Rules of Evidence[7] is whether lay opinion testimony would be helpful to the jury. See United States v. Fowler, 932 F.2d 306, 312 (4th Cir.1991). This case centered on a credibility contest between Chapman and Sanchez over the meaning of a few words during a tape-recorded phone conversation. Sanchez's argument that Chapman should not have been allowed to testify regarding the meaning of a conversation available to the jury lacks any merit. Chapman's interpretation was helpful to the jury because the conversation allegedly involved code words for a drug deal. Sanchez properly attempted to discredit Chapman through cross-examination and by offering his own interpretation by testifying himself. The jury simply found Chapman's version more credible.
 
 
 31
 We find that the testimony of Officer Grant and Agent Watson also could have been helpful to the jury. Officer Grant testified that Chapman had warned him before calling Sanchez that the conversation would involve golf terms, not drug terms. This testimony could have helped the jury understand that Chapman did not manufacture the golf code after the conversation. Agent Watson provided the potentially helpful information that phone conversations regarding drug deals rarely mention drugs and often involve codes, and that the conversation between Sanchez and Chapman conformed to many other drug conversations he had heard during his career.[8]
 
 
 32
 Given the independent evidentiary value of the testimony of Officer Grant and Agent Watson, as well as its merely cumulative effect, we find that their testimony did not impermissibly bolster Chapman's testimony. The jury did not have to believe Chapman, who they knew was a drug dealer and who had made a deal to reduce his own sentence, but they did. We find no reversible error in admitting the additional testimony regarding the taped conversation and will not disturb the jury's verdict.
 
 VI.
 
 33
 Sanchez raises issues on appeal suggesting that he may not have been given a perfect trial, but our review of the record indicates that he fails to demonstrate that he was denied a fair trial as required by the Constitution. See United States v. Blevins, 960 F.2d 1252, 1254 (4th Cir.1992). For the foregoing reasons, we affirm Sanchez's conviction.
 
 
 34
 AFFIRMED.
 
 
 
 [1]
 Three tapes were made of three different conversations, but only two were submitted into evidence. The government did not account for the third tape
 
 
 [2]
 In his brief to this Court, Sanchez mentions that he believed she was putting cocaine in his food, Appellant's Br. at 10, but the trial transcript does not show that Sanchez offered this particular explanation on cross-examination
 
 
 [3]
 Sanchez's attorney objected only to the form of a question to Agent Watson. JA at 175
 
 
 [4]
 Sanchez also raises the technical argument that the prosecutor asked many leading questions to elicit necessary testimony from Chapman. Sanchez points out two strings of leading questions by the prosecutor, but Sanchez did not object at trial and the questions readily could have been rephrased. Furthermore, the examples cited by Sanchez mainly involved background information. Therefore, we find that allowing the leading questions did not constitute plain error
 
 
 [5]
 Rule 403 of the Federal Rules of Evidence provides:
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
 
 
 [6]
 Rule 404(b) of the Federal Rules of Evidence provides:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....
 
 
 [7]
 Rule 701 of the Federal Rules of Evidence provides:
 If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.
 
 
 [8]
 Although the district court did not formally recognize Agent Watson as an expert witness under Rule 702 of the Federal Rules of Evidence, Sanchez did not make any objections at trial regarding Agent Watson's qualifications or the appropriateness of expert testimony on drug code words. We need not address these issues, however, because Sanchez did not raise them on appeal